Matthew P. Canini
Randy Moonan
Zachary Candelaria
**SILLS CUMMIS & GROSS P.C.**
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

*Platinum Edge Limited*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **PLATINUM EDGE LIMITED,** | |
| **Plaintiff,** | *Document Electronically Filed* |
| **v.** | **COMPLAINT** |
| **LUISA INGARGIOLA AND MENG LI** | JURY TRIAL DEMANDED |
| **Defendants.** | |

Plaintiff Platinum Edge Limited, by its attorneys Sills Cummis & Gross, P.C., brings this action against Meng Li and Luisa Ingargiola and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for fraud, securities fraud, fraudulent inducement, and, alternatively, negligent misrepresentation. Luisa Ingargiola and Meng Li, acting on behalf of Avalon Globocare Corp. ("Avalon"), as its CFO and CEO, respectively, defrauded Platinum Edge Limited ("Platinum") into consenting to take assignment of Avalon's Series C Equity as partial satisfaction of a prior $1 million debt, and to approve the acquisition of RPM Interactive by Avalon through the issuance of Series E Preferred Equity based on false statements that Avalon would honor the terms of the Securities Purchase Agreement between it and the Series C's previous holder, York Sun Investment Holding Limited ("York Sun").

## PARTIES

2. Plaintiff Platinum Edge Limited ("Plaintiff") is and has been an international business company incorporated in Seychelles. Plaintiff's principal place of business is in the Country of Singapore.

3. Defendant Luisa Ingargiola ("Ingargiola") is, upon information and belief, a citizen of the State of Florida, residing at 736 Harbor Palms Ct., Palm Harbor, Florida 34683.

4. Defendant Meng Li ("Li") is, upon information and belief, a Citizen of the State of New Jersey, residing at 124 Gravel Hill Rd, Freehold, New Jersey 07728.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Platinum and Defendants and an amount in controversy exceeding $75,000, exclusive of interest and costs.

6. This Court also has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, with supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367.

7. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District, and the Defendants Ingargiola and Li regularly conduct business in this District and are subject to the Court's personal jurisdiction with respect to this action, and/or a substantial part of the events or omission giving rise to the claim occurred here.

## FACTS APPLICABLE TO ALL CLAIMS

8. York Sun was the purchaser of 3,500 shares of Avalon's Series C Preferred Equity ("Series C"), which it purchased under the terms of a December 19, 2024, Securities Purchase

Agreement between York Sun, on the one hand, and Avalon, on the other hand ("SPA"). The SPA contemplated a second closing of an additional 3,500 units of Series C by June 5, 2025

9. On May 22, 2025, Nasdaq issued Avalon a notice of non-compliance after Avalon reported a stockholder's equity of negative $3,891,270, well below the required $2.5 million required to be listed on Nasdaq under Nasdaq listing rule 5550(b)(1).

10. Upon information and belief, the delisting of Avalon's stock posed a significant risk to the company and its investors because it indicates that the stock carries high financial risk, which usually results in a sharp decline in the company's value and stock price. According to public filings, both Ingargiola and Li, at relevant times, held a substantial amount of Avalon's equity or the right to purchase Avalon's equity and a decline in Avalon's stock price would cause them significant personal financial harm.

11. On May 29, 2025, Avalon and Mast Hill Fund L.P. ("Mast Hill") entered into a waiver agreement, waiving Avalon's default under Section 3.3 of Avalon's promissory note to Mast Hill. Under Section 3.3 of Mast Hill's note, Avalon was supposed to obtain Mast Hill's consent before issuing York Sun 3,500 shares of the Series C.

12. York Sun and Avalon did not close on the second tranche of 3,500 shares of Series C under the SPA, upon information and belief, in part, because it would have represented a further default under Mast Hill's note.

13. Later, on December 12, 2025, when Platinum asked Ingargiola about why York Sun did not close on the second tranche of 3,500 Series C, Ingargiola referred to the closing of the second tranche of 3,500 Series C as an option to purchase.

14. On June 4, 2025, Avalon entered into a separate securities purchase agreement with York Sun under which York Sun purchased 141,643 shares of Avalon's restricted common stock for $500,000.

15. On July 21, 2025, Mast Hill purchased 300 shares of the Series C from Avalon for $300,000.

16. On or about August 7, 2025, Platinum lent York Sun approximately $1 million as a material inducement for Platinum to make the loan, Platinum pledged, among other collateral, its 3,500 shares of Series C. Under the loan documents, Platinum had the option, but not the obligation, to acquire the Series C in partial satisfaction of the loan.

17. On October 31, 2025 and in November 2025 York Sun defaulted on its loan with Platinum.

18. Upon information and belief, at or about the time York Sun defaulted on its loan, Avalon was in discussions with RPM Interactive ("RPM") to acquire RPM in an all-stock transaction. Under the terms of the merger agreement, Avalon was to form a subsidiary, Quantum AI, LLC, and to acquire RPM in exchange for 19,500 shares of a new class of Series E Preferred Equity (the "Merger").

19. The Merger, as then contemplated, would have the effect of raising Avalon's stockholders' equity above the $2.5 million threshold required to be listed on the Nasdaq stock exchange.

20. Under the Series C's Certificate of Designation ("COD"), for Avalon to enter into the Merger, it needed to acquire York Sun's consent because the COD restricts Avalon's ability to engage in lines of business different from those lines of business conducted or publicly contemplated by Avalon. RPM Interactive is, per its website, an AI company focusing on

entertainment, and Avalon is, per its website, a medical diagnostics company. In public filings and press releases, Avalon admits that the primary purpose of the Merger was to bring the company into compliance with Nasdaq's rules to maintain the listing of its public equity there.

21. Additionally, under the SPA, to issue Series E Preferred Stock for the Merger, it needed first to offer the equity to York Sun.

22. Avalon also needed to acquire Platinum's consent due to its security interest in the Series C.

23. From in or about December 9, 2025 to December 15, 2025, Ingargiola and Li made representations to Platinum that if it Platinum consented to the Merger and took assignment Series C in partial satisfaction of York Sun's loan, it would permit Platinum to exercise York Sun's rights under the SPA, and otherwise abide by the terms of the SPA. Under the SPA, Avalon was, among other things, (1) required to seek approval from shareholders at its December 30, 2025, annual meeting permission for the holders of the Series C to convert the Series C into common equity, at their election; and (2) permit the holder of the Series C to appoint a director to Avalon's board.

24. On December 9, 2025, Ingargiola sent a document to Platinum requesting Platinum's approval of the Merger.

25. Platinum followed up with a request for a call.

26. On December 10, 2025, after Platinum did not immediately sign the document, Ingargiola wrote to Platinum "I need acknowledgement for [the Merger] signed now where is it[?] …[i]f we get delisted, it's over, so no point talking about anything until we get this AI deal done."

27. Platinum replied, "We need clarification before signing…"

28. In response to Platinum's request for clarification, Ingargiola improperly attempted to condition Platinum's receipt of the Series C on its approval of the Merger. To this end on

December 10, 2025 she wrote, “we do not need your approval to buy the AI company. The document I sent was a courtesy to expedite the transfer of your share in your name. We can just wait until after the acquisition and then do you’re your transfer….”

29. Platinum, knowing this to be false, and realizing that Ingargiola was attempting to wrongly tie the transfer of York Sun’s Series C to Platinum’s approval of the Merger, threatened not to sign the approval for the Merger and to initiate legal proceedings.

30. This led to a December 11, 2025, call at 9:27 a.m.

31. During the call, Ingargiola stated that if Platinum consented to the Merger and assisted Avalon in maintaining its Nasdaq listing, Avalon would recognize Platinum as the holder of the Series C and honor the SPA vis-à-vis Platinum, including its right to appoint a board member.

32. Avalon’s request for Platinum's consent to the Merger reinforced Platinum’s then belief that Li and Ingargiola’s representations asserting that Avalon would permit Platinum to exercise York Sun’s rights under the SPA were true.

33. On December 12, 2025, following the call, Ignargiola wrote: “I will have the director paperwork today before [Platinum’s] morning.”

34. Based on Li’s and Ingargiola’s representations, on December 12, 2025, Platinum, at Avalon’s request, issued Avalon a letter stating, “[it] will not object to, or any exercise any right as holders of Series C Preferred Stock, to prevent the consummation of the Merger and the issuance of the Series E Preferred Stock as consideration for the Merger.”

35. Platinum would not have issued this letter but for Ingargiola’s and Li’s representations.

36. On December 15, 2025, the Merger closed.

37. Unbeknownst to Platinum at this time, York Sun had previously sold 950 of its 3,500 shares to Mast Hill, with Avalon's prior approval – a fact that, upon information and belief, was not disclosed in public filings until March 13, 2026.

38. Ingargiola did not disclose this fact to Platinum.

39. As noted above, on December 12, 2025, Platinum wrote to Ingargiola stating, "to confirm only 3,500 shares and not 7000 shares [have] been sold to York [S]un," and in response, Ingargiola stated, "confirmed." Upon information and belief, prior to this statement, York Sun transferred the 950 shares to Mast Hill in violation of Platinum's security interest and with the assistance of Avalon.

40. To induce Platinum to accept 2,550 shares of Series C through a document encompassing extensive releases for Ingargiola, Avalon, and others, Ingargiola committed, in a WeChat communication, to transfer 150,000 common shares to Platinum. Additionally, in the same message, Ingargiola stated, "[o]nce you become a director you will receive 100,000 options like the other directors."

41. On December 16, 2025, counsel for Avalon wrote to counsel for Platinum stating, "the company is prepared to process the transfer of the 2,550 shares…"

42. On December 17, 2025, counsel for Avalon and Platinum circulated a draft assignment agreement of 2,550 shares of the Series C assigning these shares to Platinum from York Sun to Platinum, with the approval of Avalon.

43. Subsequently, on the same date, Ingargiola wrote to Platinum stating, "to expedite, just send the DocuSign as is for the [Series C], and we will deal with the 150k after."

44. On December 17, 2025, Ingargiola also wrote to Platinum by WeChat, "[y]our board seat can be assigned at any time to whoever you want. They just need to complete the questionnaire, and then will be immediately appointed."

45. On December 18, 2025, based on these representations, Platinum accepted the assignment of 2,550 shares of the Series C from York Sun, which also contained broad releases of Avalon and its officers by both York Sun and Avalon.

46. Plaintiff would not have executed this document but for Ingargiola's representations that it would receive 150,000 common shares of Avalon and be allowed to appoint a board member under the SPA. Ingargiola also promised that platinum would receive an additional 1 million preferred shares if it executed the document.

47. On December 19, 2025, Li flew to Hong Kong to meet with Platinum's representative at 3:00 p.m. at a restaurant located at 152 Queens Road Central, Central, Hong Kong. During the meeting, Li promised that Platinum would be able to exercise all York Sun's rights under the SPA.

48. On December 30, 2025, Li's representations were proven false when Avalon failed to seek approval from its shareholders to permit conversion of the Series C into common equity. Had Avalon placed this issue before the shareholders on this date, and the shareholders approved, then Platinum could have converted the Series C into common equity sooner, achieved the rights of a holder of Avalon's common equity, including major shareholder voting rights that it does not now have.

49. By delaying the December 30, 2025, meeting, Platinum was diluted through a series of subsequent financings over which it had no say because Avalon refused to appoint its board member or convert its shares, thereby depriving it of the opportunity to vote on other directors.

Had Platinum been permitted to convert its shares on December 30, 2025, it would have been Avalon's largest shareholder with voting rights.

50. On January 5, 2024, Platinum wrote to Ingargiola identifying its chosen director.

51. On January 6, 2024, Ingargiola responded by soliciting IPO work from Platinum, stating, "I know everyone at Nasdaq, NYSE, and Trump group. Also have access to high-level SEC through Pam [Bondi]."

52. Platinum did not respond to this; instead, it followed up on the appointment of the Board seat.

53. In response, on January 7, 2026, Ingargiola stated that she was setting up a meeting with Avalon's Board.

54. When Platinum inquired whether an interview was necessary for the appointment, Ingargiola responded, "[o]f course an interview is not required as you have a right to appoint any qualified director that you want for your seat; it is a courtesy to the board so they can say hello while at the same time we work on the paperwork for this…I'm trying to expedite everything."

55. On January 8, 2026, Avalon's Board met with Platinum's director representative and approved his appointment.

56. Upon information and belief, no public disclosures or SEC filings were made regarding the Board's decision to appoint Platinum's director representative.

57. On January 10, 2026, Ingargiola wrote to Platinum, stating, "[a]s I said, we are working on the paperwork now. I expect the appointment of a Director by Monday, and then [we] will do a press release on Wednesday since we already have the Nasdaq release Monday." Ingargiola also requested Platinum's director to fill out the documents required to be filed with the SEC and Nasdaq, and to have them notarized.

58. On January 12, 2026, Avalon received notice from Nasdaq that, due to the Merger, it was now in compliance with Nasdaq's stockholders' equity requirement under Nasdaq Listing Rule 5550(b), and was not in danger of being delisted for this reason.

59. On January 17, 2026, Li had a conference call with a Platinum representative, during which she reassured Platinum of its right to the Board seat and rights under the SPA.

60. Avalon, however, never appointed Platinum's director and never announced his appointment as previously represented by Ingargiola. Mere days after Avalon was no longer at risk of being delisted, Ingargiola and Li reversed Avalon's position and began denying Platinum its rights.

61. Avalon also never transferred the 150,000 shares it promised for Platinum to accept only 2,550 Series C and issue releases.

62. On February 2, 2026, Platinum spoke with an RPM Interactive's representative, Rob Knie, who promised to work with Platinum to have a Board member appointed.

63. However, on February 3, 2026, Platinum again spoke with Knie. At this meeting, Knie—who said he had spoken with Ingargiola—stated Avalon's position was that it now had to invest an additional $1.5 million with Avalon or try to push Avalon's share price above $1.00 if Platinum wanted Avalon to comply with its obligation to place Platinum's director on Avalon's board.

64. Thereafter, Platinum, through counsel, made various demands that Avalon fulfill its obligations under the SPA. Avalon refused, claiming, disingenuously and piecemeal, that: (1) York Sun had breached the SPA by failing to close on the second tranche of Series C; (2) Platinum was not the proper assignee of the SPA; and (3) Platinum had released Avalon and its directors.

65. Avalon's excuses are baseless. Li and Ingargiola fraudulently induced Platinum to accept the Series C assignment (which contained the releases) and agree to the Merger, which restored Avalon's Nasdaq compliance, based on express representations that Platinum could appoint a director and exercise York Sun's other rights under the SPA.

66. These representations were false and, upon information and belief, known to be false when made. They were made with the intent to defraud Platinum because, upon information and belief, Ingargiola and Li desperately needed Avalon to regain Nasdaq compliance to protect their own financial interests in the company.

67. Upon information and belief, Ingargiola and Li never intended to fulfill their promises because doing so would cause additional issues with Nasdaq. Since the Series C has no voting rights under the SPA, appointing a director based on the Series C could violate Nasdaq's rules, which state that an investor may have board designation rights only in proportion to its overall votes. However, under the SPA, the right to appoint a director is not dependent on Nasdaq compliance, nor did Li or Ingargiola ever state otherwise.

68. Upon information and belief, understanding this, and that Avalon would never allow Platinum to appoint a Board member, Li and Ingargiola nonetheless induced Platinum to accept the assignment of the Series C and consent to the Merger.

**COUNT I**

(**Common Law Fraud Against Li and Ingargiola**)

69. Plaintiff repeats and realleges the allegations contained above, as if fully set forth here.

70. Li and Ingargiola made material misrepresentations of fact to Platinum both orally and in writing, on the dates and at the times specified above, including but not limited to representations regarding Plaintiff's right to appoint a director to Avalon's board, the process and

timing for seeking shareholder approval for the conversion of Series C, the amount of Series C, the payment of 150,000 shares of common stock, the payment of an additional 1 million preferred shares, as well as material omissions regarding Avalon's intent and ability to perform these obligations.

71. These material misrepresentations were made in connection with Platinum's acceptance of 2,550 units of Series C from York Sun in partial satisfaction of its $1 million loan, Avalon's approval of that assignment, Platinum's issuance of releases to Avalon, and Platinum's approval of the Merger.

72. Upon information and belief, for the reasons stated above, Ingargiola and Li knew these representations were false or acted with reckless disregard for their truth.

73. Upon information and belief, for the reason stated above, the representations were made with the intent to induce Platinum to rely on them, including to induce Platinum's consent to Merger, forbear commencing legal proceedings due to Avalon's failure to put the issue of the conversion of Series C into common equity before the shareholders at Avalon's December 30, 2025 annual meeting, and the issuance of alleged releases of Avalon and its officers, Li and Ingargiola.

74. Platinum reasonably and justifiably relied on Ingargiola's and Li's misrepresentations due to their course of conduct and ongoing efforts to conceal the fraud until Avalon regained its listing status on Nasdaq, which included, among other things, an interview with Avalon's Board, actual Board approval, and repeated promises that Avalon would comply with the SPA.

75. As a result of Defendant's fraudulent conduct, Plaintiff has suffered damages, including, but not limited to, a potential loss of rights under the SPA, diminution of the value of

its investment, the potential loss of legal claims, a delay in receiving its voting rights, dilution of its ownership interest in Avalon, lost opportunities to sell the Series C or converted common shares, and other pecuniary harm.

76. Wherefore, Platinum demands judgment, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $5 million, plus pre- and post- judgment interest, consequential, incidental, and expectation damages, punitive damages, costs, disbursements, and legal fees.

**(COUNT II)**

**(Securities Fraud – Material Misrepresentations (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b))**

77. Plaintiff repeats and realleges the allegations contained above, as if fully set forth here.

78. Defendant, in connection with the purchase and sale of securities, including, but not limited to, Platinum's acceptance of the Series C and approval of the Merger, made untrue statements that Platinum could exercise York Sun's rights under the SPA, including Avalon holding a shareholder meeting on December 30, 2025 to approve conversion of the Series C, and the appointment of a Board director.

79. As set forth above, Defendants acted with scienter in making these misrepresentations, intending to deceive, manipulate, or defraud Platinum for their own personal benefit to maintain Avalon's Nasdaq listing and protect their own financial positions. The representations Ingargiola and Li made were made with the specific intent to defraud and with knowledge that Avalon would never fulfill those promises because appointing Platinum's director could cause additional Nasdaq delisting issues, the very circumstance they defrauded Platinum to avoid.

80. As set forth above, Platinum reasonably and justifiably relied on Ingargiola's and Li's misrepresentations and omissions in accepting the assignment of the Series C and approving the Merger.

81. As set forth above, Platinum has been damaged by Ingargiola's and Li's fraud and as a direct and proximate result of the same, including, but not limited to, in the form of a loss of rights under the SPA, a diminution of the value of its investment, the potential loss of legal claims, a delay in receiving its voting rights, lost opportunities to sell the Series C or converted common shares, and other pecuniary harm.

82. Wherefore, Platinum demands judgment, jointly and severally, in an amount to be determined at trial but believed to be in excess of $5 million, plus pre- and post- judgment interest, consequential, incidental, and expectation damages, punitive damages, costs, disbursements, and legal fees.

**(Count III)**

**(Securities Fraud Under N.J.S.A. § 49:3-52)**

83. Plaintiff repeats and realleges the allegations contained above, as if fully set forth here.

84. Defendant, in connection with the purchase and sale of securities, namely Platinum's acceptance of the Series C and approval of the Merger, made untrue statements that Platinum could exercise York Sun's rights under the SPA, including Avalon holding a shareholder meeting on December 30, 2025 to approve conversion of the Series C, and the appointment of a Board director.

85. As set forth above, Defendants acted with scienter in making these misrepresentations, intending to deceive, manipulate, or defraud Platinum for their own personal benefit to maintain Avalon's Nasdaq listing and protect their own financial position. The

representations Li and Ingargiola made were made with the specific intent to defraud and with knowledge that Avalon would never fulfill those promises because appointing Platinum's director representative could cause additional Nasdaq delisting issues, the very circumstance they defrauded Platinum to avoid.

86. As set forth above, Platinum reasonably and justifiably relied on Ingargiola's and Li's misrepresentations and omissions in accepting the assignment of the Series C and approving the Merger.

87. As set forth above, Platinum has been damaged by Ingargiola's and Li's fraud and as a direct and proximate result of the same, including, but not limited to, in the form of a loss of rights under the SPA, a diminution of the value of its investment, the potential loss of legal claims, a delay in receiving its voting rights, lost opportunities to sell the Series C or converted common shares, and other pecuniary harm.

88. Wherefore, Platinum demands judgment, jointly and severally, in an amount to be determined at trial but believed to be in excess of $5 million, plus pre- and post- judgment interest, consequential, incidental, and expectation damages, punitive damages, costs, disbursements, and legal fees.

**(Count IV)**

**(Common Law Fraudulent Inducement Against Li and Ingargiola)**

89. Plaintiff repeats and realleges the allegations contained above, as if fully set forth here.

90. Defendants made material misrepresentations and omissions of fact, collateral to the SPA, the assignment of the Series C, and associated transactions, knowing they were false and intending to induce the Plaintiff to enter into or agree to accept the Series C assignment, and agree to the Merger.

91. Plaintiff justifiably relied on these misrepresentations and omissions in entering into or consenting to the relevant transactions.

92. Plaintiff suffered damages as a result of such reliance, including but not limited to accepting the Series C in exchange for partial satisfaction of its loan to York Sun and allegedly issuing Avalon and its officers releases.

93. Wherefore Plaintiff demands judgment, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $1 million, rescission of the releases in the Series C assignment, pre- and post-judgment interest, consequential, incidental, and expectation damages, punitive damages, costs, disbursements, and legal fees.

**COUNT V**

**(In the Alternative, Common Law Negligent Misrepresentation)**

94. Plaintiff repeats and realleges the allegations contained above, as if fully set forth here.

95. If, and to the extent, Ingargiola and Li did not have the intent to defraud Platinum, their representations were, at the very least, negligently made.

96. Ingargiola and Li had a special duty to disclose the fact that Avalon would not honor the terms of the SPA vis-à-vis Platinum if doing so would run afoul of Nasdaq listing rules.

97. Ingargiola and Li, as officers of Avalon, were attempting to obtain Platinum's consent to the Merger, even though Avalon was not, at that time, in direct privity with Platinum.

98. Platinum placed trust and confidence in Ingargiola and Li, which was necessarily implied from the circumstances and nature of the relationship dealings. These circumstances imposed a duty on Ingargiola and Li to disclose material facts to Platinum.

99. Defendants provided incorrect information to Platinum regarding Platinum's rights to appoint a Board member and the circumstances under which Avalon would agree to do so.

100. Wherefore, Platinum demands judgment, jointly and severally, in an amount to be determined at trial but believed to be in excess of $5 million, plus pre- and post- judgment interest, consequential, incidental, and expectation damages, punitive damages, costs, disbursements, and legal fees.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

Wherefore, Platinum demands judgment as follows:

A. On Count I for Common Law Fraud, jointly and severally, against Ingargiola and Li, in an amount to be determined at trial, but believed to be in excess of $5 million, plus pre- and post- judgment interest, consequential, incidental, and expectation damages, punitive damages, costs, disbursements, and legal fees.

B. On Count II, for Federal Securities Fraud, jointly and severally, against Ingargiola and Li, in an amount to be determined at trial, but believed to be in excess of $5 million, plus pre- and post- judgment interest, consequential, incidental, and expectation damages, punitive damages, costs, disbursements, and legal fees.

C. Count III, for Securities Fraud under N.J.S.A. § 49:3-52, jointly and severally, against Ingargiola and Li, in an amount to be determined at trial, but believed to be in excess of $5 million, plus pre- and post- judgment interest, consequential, incidental, and expectation damages, punitive damages, costs, disbursements, and legal fees.

D. Count IV, for Common Law Fraudulent Inducement, jointly and severally, against Ingargiola and Li, in an amount to be determined at trial, but believed to be in excess

of $1 million, rescission of the releases in the Series C assignment, pre- and post-judgment interest, consequential, incidental, and expectation damages, punitive damages, costs, disbursements, and legal fees.

E. On Count V, in the alternative, for Negligent Misrepresentation, jointly and severally, against, against Ingargiola and Li, in an amount to be determined at trial, but believed to be in excess of $5 million, plus pre- and post- judgment interest, consequential, incidental, and expectation damages, punitive damages, costs, disbursements, and legal fees.

**SILLS CUMMIS & GROSS P.C.**
Platinum Edge Limited

By: *\/s/ Matthew Canini*
Matthew P. Canini

Dated: April 8, 2026